**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. _____ |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| VIDEOAMP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR PATENT INFRINGEMENT**

The Nielsen Company (US), LLC ("Nielsen" or "Plaintiff"), for its Complaint against

Defendant VideoAmp, Inc. ("VideoAmp" or "Defendant"), alleges as follows:

**NATURE OF THE ACTION**

1.     This is an action for patent infringement against Defendant VideoAmp for

infringing United States Patent No. 12,063,402 ("the '402 patent").

**PARTIES**

2.     Plaintiff is organized and exists under the laws of the State of Delaware.

3.     According to public records, VideoAmp is incorporated in Delaware and is

headquartered in Los Angeles, California.

**JURISDICTION AND VENUE**

4.     This is an action for patent infringement arising under the Patent Act, 35 U.S.C.

§§ 1 *et seq.* This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1338(a).

5.     This Court has personal jurisdiction over VideoAmp because Defendant is a

Delaware corporation and on information and belief, regularly transacts business in Delaware.

Defendant has a registered agent in Delaware: The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

6.      Venue is proper pursuant to 28 U.S.C. § 1400(b) because Defendant resides in this District.

**FACTUAL BACKGROUND**

7.      Nielsen is the media industry's leading data and analytics company. Nielsen helps the industry price advertising by providing an accurate understanding of media consumption in all channels and platforms. Nielsen measures linear television, streaming TV, social media, and online video/audio. Nielsen's data allows its clients and partners to optimize their marketing investments and growth strategies.

8.      Nielsen is a major innovator in the technology used to measure audiences and has received numerous patents for its inventions, including the patent-in-suit. Nielsen invests millions of dollars in audience measurement innovations and their implementation. Nielsen's innovations enable its industry-leading measurement and analytics products and services.

9.      Nielsen's measurement and analytics products and services are the gold standard for understanding who is watching what media. Nielsen's data offers a "currency" that reduces financial risk and promotes competition. The majority of the industry considers Nielsen's data to be a currency that ad buyers and sellers use for buying and selling advertising and to negotiate the price and volume of advertisements. Ad buyers use Nielsen's data to compare their campaigns across publishers or distribution channels and to negotiate their ad buys on comparable terms. Ad sellers, such as television networks, cable distributors, and publishers, also want to use a common currency.

2

10.    Nielsen's products and services leverage measurement technologies including those used to measure out-of-home viewing. Nielsen measures out-of-home ("OOH") viewing to understand consumer behavior and to generate accurate data of viewing audiences. "Nielsen has been capturing viewing that occurs outside of the home, including airports, hotels, bars and restaurants. Through proprietary Portable People Meter (PPM) Wearables technology, Nielsen has delivered metrics for out-of-home audiences to ensure clients can track viewer consumption regardless of the platform, screen or location. By adding additional homes to the PPM Wearables footprint, Nielsen's OOH coverage will expand from 65% to 100%. Capturing this viewing audience is critical for genres of television that people tend to watch communally, particularly sporting events, which continue to grow as one the most important programming genres in live television." Ex. 4, https://www.nielsen.com/news-center/2024/nielsen-expands-national-out-of-home-panel-bringing-coverage-to-100-of-u-s-tv-households/.

11.    VideoAmp uses Nielsen's patented technology to, as it asserts, "becom[e] the leading modern media currency in the United States." Ex. 5, https://videoamp.com/blog/a-letter-from-our-founder/. VideoAmp provides its data to "most of the world's largest media companies: from Amazon, Disney, YouTube, Warner Bros. Discovery, Facebook/Instagram, NBCU, Paramount, Weather Channel, TelevisaUnivision, Hallmark and more." *Id.* VideoAmp's founder, Ross McCray, claims that VideoAmp has "seen over 1,400% year over year growth of VideoAmp media currency transactions in 2023 and next year looks even bigger. Over 1,000 advertisers have already booked billions of dollars of guarantees on our currency in 2024." *Id.* Public sources describe VideoAmp as being "used as a currency in $2 billion of TV deals in the past year." Ex. 6, https://adage.com/article/measurement/videoamp-ceo-ross-mccray-steps-down-company-lays-20-staff/2535441. And "VideoAmp has established itself as the primary rival to

Nielsen in TV currency, offered as an option by the widest number of TV networks plus Amazon Prime and YouTube." *Id.*

## THE ASSERTED '402 PATENT

12.     The '402 patent, entitled "Methods and Apparatus to Correlate Census Measurement Data with Panel Data," was duly and legally issued on August 13, 2024. A true and correct copy of the '402 patent is attached hereto as Exhibit 1.

13.     The '402 patent issued from U.S. Patent Application No. 18/600,254, which was filed on March 8, 2024. The '402 patent descends from a series of continuations, of which the ultimate parent is U.S. Patent Application No. 14/132,626, filed on December 18, 2013, now U.S. Patent No. 9,635,404. In addition, the '402 patent descends from Provisional Application No. 61/815,544, filed on April 24, 2013.

14.     Nielsen is the assignee and owner of all right, title, and interest in the '402 patent. The '402 patent is valid and enforceable.

15.     The declaration of Virginia Lee, attached hereto as Exhibit 2, is hereby incorporated by reference into this Complaint.

16.     The '402 Patent and its claims are directed to, among other things, systems, methods, and apparatuses for improving the field of audience measurement technology. Ex. 2, ¶8. Specifically, the patent claims improve audience measurement by associating media content exposure data with audience member demographics, including expanding the places and circumstances where such measurement can accurately occur. Such places may include locations outside the home, within the home itself, or in specific environments such as offices, bars, and restaurants. *Id.*

4

17.    The invention improves audience measurement technology by allowing the connection of audience demographics to media impressions. Ex. 2, ¶9. In previous systems, "[c]ollecting information at the server level enables an accurate measure of information served by the monitored servers, but does not enable distinguishing media impressions from panelists and non-panelists or exposure to cached media (*e.g.*, content served once and accessed one or more subsequent times from local memory)." Ex. 1, 3:67-4:5.

18.    "Census data" is audience measurement data collected without associated demographic data when the system cannot connect media consumption to particular individuals or demographics. Ex. 1, 3:63-4:4; Ex. 2, ¶10. In the invention, rather than collecting solely census data, the invention allows associating media content with audience demographics. *Id.*

19.    The invention enables audience measurement entities ("AMEs") to use location to associate media content playing at a reference location with the demographics of the people consuming the content. Ex. 2, ¶11. The invention involves, among other things, receiving information about media content being played at a particular reference location. *Id.* That location could be a panelist's home, other places frequented by the panelist, or a business such as a gym, bar, or restaurant. *Id.* Also received is an audience member's location and an identifier of the audience member's mobile device. *Id.* The invention determines whether the audience member's location corresponds to the reference location, thereby determining that the audience member is an individual who has been exposed to the known media content being presented at that reference location. *Id.* The invention then associates the demographics of the audience member (accessed via the identity of the audience member or the identifier of the mobile device) with the media content being presented at the reference location. *Id.*; Ex. 1, 1:42-45 ("The media identifying data and the people data can be combined to generate, for example, media exposure

data indicative of amount(s) and/or type(s) of people that were exposed to specific piece(s) of media."); 1:39-41 ("people data (e.g., user identifier(s), demographic data associated with audience member(s), etc.)."); 19:6-10 ("While in the illustrated example the panelist identifier 704 is used, any other information that may be used to identify the panelist may additionally or alternatively be used such as, for example a mobile device identifier…a telephone number…etc."). As the '402 patent explains, media content includes "any type of content and/or advertisements such as broadcast television and/or radio, stored audio and/or video played back from a memory such as a digital video recorder or a digital video disc, a webpage, audio and/or video presented (e.g., streamed) via the Internet, a video game, etc." Ex. 1, 1:31-36.

20.     The asserted claims recite receiving a message from a mobile phone that contains (1) the phone's location and (2) its identifier. The '402 patent describes the client device (*e.g.*, a mobile phone) transmitting information identifying itself: "[T]he media request 202 includes a user agent identifying … the client device 106 such as … a device identifier, etc." Ex. 1, 8:54-57; 13:56-59 ("[T]he user agent may include a network address, a media access control (MAC) address, a telephone number, etc. associated with the client device 106."); *see also* 14:29-31 ("an identifier of the client device 106 (e.g., an international mobile equipment identity (IMEI) number, a cookie, a MAC address, etc.)."); 19:7-10 ("[A]ny other information that may be used to identify the panelist may additionally or alternatively be used such as, for example, a mobile device identifier (e.g., a MAC address), a panelist name, a telephone number, a cookie, etc."). The client device can be a smartphone ("mobile device"). Ex. 1, 7:16-18 ("[T]he client device 106 is a smartphone (e.g., an Apple® iPhone®, a Motorola™ Moto X™, a Nexus 5, an Android™ platform device, etc.).").

21.    A mobile device's identifier is associated with demographic information of the mobile device's user. *See e.g.*, Ex. 2, ¶13; Ex. 1, 4:13-20 ("[A]udience measurement entities (sometimes referred to herein as 'ratings entities') traditionally determine online media reach and frequency based on registered panel members. That is, an audience measurement entity enrolls people that consent to being monitored into a panel. In such panelist-based systems, demographic information is obtained from a user when, for example, the user joins and/or registers for the panel."); 8:54-57 ("[T]he media request 202 includes a user agent identifying characteristics of the browser 200 and/or the client device 106 such as a browser identifier, a device identifier, etc."); 13:56-59 ("[T]he user agent may include a network address, a media access control (MAC) address, a telephone number, etc. associated with the client device 106."); 17:36-44 ("[T]he data table 500 may include additional information such as device identifiers (e.g., a telephone number of the client device, a media access control (MAC) address of the client device, a serial number of the client device, etc.)"); 18:24-27 ("[T]he data table 600 may include more demographic information associated with the registered panelists such as, for example, race, income, level of education completed, occupation, etc."); 19:6-10 ("While in the illustrated example the panelist identifier 704 is used, any other information that may be used to identify the panelist may additionally or alternatively be used such as, for example, a mobile device identifier (e.g., a MAC address), a panelist name, a telephone number, a cookie, etc."). Cell phone companies and others store information associating a mobile device identifier with an individual's demographic information. Ex. 2, ¶13; *see* Ex. 1, 1:31-45; 5:60-62; 19:6-10. Information connecting mobile device identifiers to demographics may also be available from third-party companies. Ex. 2, ¶13. Demographic information may include information about "race, age or age range, gender, income, home location, education level, etc." Ex. 1, 4:21-22.

22.    The claims recite comparing the location of the audience member's mobile device to a reference area. A "reference area" is a geographic area of any shape or size. Ex. 1, 11:35-38 ("[A]lthough the reference area 316 is represented as an ellipse in the illustrated example, the reference area 316 may be another shape such as a circle, a hexagon, or any other suitable shape."); *see also* 13:6-10. A reference area may correspond to the user's home or office or a gym, an office building, or other public space. Ex. 1, 17:60-64; 26:10-11 ("[T]he reference location is a place of business."). When an audience member's location matches a known reference area, it becomes known that this audience member has been exposed to the particular media content being presented at the reference location. Ex. 2, ¶14. In one example, when the reference area is a bar, determining that the audience member is in that bar (*i.e.,* determining that the audience member's location falls within the reference area of the bar) results in knowing that the audience member has been exposed to the media content playing on a television at that bar when the audience member was there. *Id.*

23.    The claims recite accessing media identifying information identifying the media content being presented at the reference location during a time interval. In other words, the invention describes knowing what media content is presented at a reference location (*e.g.,* business location such as a bar or restaurant) at a particular time. As an example, this data might show that a television in a particular bar displayed Monday Night Football from 9 pm to 11 pm. Ex. 2, ¶15.

24.    The claims recite associating media identifying information with the audience member's demographic information. Ex. 2, ¶16. In particular, the '402 patent describes using location information (*e.g.,* as described above in ¶ 22 and below) to associate media content with particular individuals and their demographics. *Id.* "Audience measurement of media … often

involves collection of media identifying data (*e.g*., signature(s), fingerprint(s), code(s), tuned channel identification information, time of exposure information, etc.) and people data (*e.g*., user identifier(s), demographic data associated with audience member(s), etc.). The media identifying data and the people data can be combined to generate, for example, media exposure data indicative of amount(s) and/or type(s) of people that were exposed to specific piece(s) of media." Ex. 1, 1:31-45. As the '402 patent explains, "when the AME server 102 receives a beacon including device location information positioned within the reference area 356, the AME server 102 associates the corresponding monitoring information with the demographic information associated with the household 350." Ex. 1, 12:55-60.

25.     Because monitoring information associated with demographic information provides more insight into media content's audience and is more valuable and precise than census data, the invention improves audience measurement technology. Ex. 2, ¶17; Ex. 1, 18:66-19:1 ("[I]dentifying whether the exposure was monitored via census data or panelist data 702 may be beneficial for analysis purposes.").

26.     Substantial media content is consumed outside the home, including in public venues such as bars and restaurants and other business establishments. Ex. 2, ¶18. Not knowing the demographics of who is exposed to out-of-home content leaves a substantial gap in the specificity of audience measurement data and results in census data rather than the more useful data associated with demographic information. Ex. 2, ¶18; Ex. 1, 18:43-46; 18:66-19:3 ("[I]dentifying whether the exposure was monitored via census data or panelist data 702 may be beneficial for analysis purposes."). This issue can be particularly important for sports programming where large numbers of viewers commonly watch in bars and restaurants. Ex. 2, ¶18.

27.     The invention in the '402 patent improves audience measurement technology by solving problems relating to audience measurement, including out-of-home measurement. The invention allows the measurement of more useful data associating content with audience demographics rather than the less insightful census data. This technological solution has real-world implications, as information about the demographics of an audience is important to media content providers and their advertisers. Ex. 2, ¶19.

28.     The invention improves audience measurement technology by allowing monitoring in a way that was not previously done and, as such, is a specific technological solution to prior art problems. Ex. 2, ¶20. Prior art technology had limitations in its ability to associate known media content information with demographic information (*e.g.*, measuring out-of-home audiences). *Id.* For example, in certain circumstances, while a prior art audience measurement entity might have known what media content was playing on televisions in certain places, it had no way to correlate that content to audience demographics at that place. *Id.* It therefore had to rely on manual self-reporting or settle for less valuable and precise census data. *Id.*

29.     The invention recognizes that a mobile device commonly has access to and can report its location, which can be within a reference area. Ex. 2, ¶21. For example, for a bar at a known location that has a television playing known content, the invention can determine whether a particular audience member is present at the reference location and exposed to the content. *Id.* When it is determined that a particular audience member is present at the reference location, the identifier of the audience member's mobile device may be used to retrieve the audience member's demographic information and to associate that demographic information with the

known content. *Id.* The invention is thus a specific technological solution to prior art problems (including measuring out-of-home viewing) that had been previously unsolved. *Id.*

30.     As of the '402 patent's provisional application's filing on April 24, 2013, and also as of the non-provisional parent's filing on December 18, 2013, it was not well-understood, routine, or conventional among those of skill in the art to measure media audiences by associating demographic data with media content using location, as claimed in all claims of the '402 Patent. Ex. 2, ¶22; s*ee e.g.*, Ex. 1, '402 Patent, Claims. For example, claim 1 recites, *inter alia*, "associating the media identifying information with the demographic information responsive to determining that the media content was presented within the reference area during at least the portion of the time interval." In other words, the invention correlates media content and viewer demographics using location. Ex. 2, ¶22.

31.     In addition, the claimed combination of elements was not well-understood, routine, or conventional as of April 24, 2013, or as of December 18, 2013. Ex. 2, ¶23. In the prior art, location and a mobile device identifier had not been used as a means of associating the media content with demographic information. In other words, as of April 24, 2013, and as of December 18, 2013, the claimed technique of correlating media content to audience demographics using location was not well-understood, routine, or conventional among those of skill in the art. *Id.*

32.     The manner in which this invention operates demonstrates that it was not well-understood, routine, or conventional before the invention. Ex. 2, ¶24. For example, an audience member with a mobile phone may be present in a business, such as a bar (*e.g.*, a reference location), and be exposed to certain media there. *Id.* The audience member's phone, via an app that the audience member has installed on their phone (such as a weather app), tracks their

location (*e.g.*, their geographic location). *Id.* The location-tracking app on the audience member's phone sends a message to a server with the location of the phone (*e.g.*, its GPS components) and its identifier (*e.g.*, its phone number or other identifier). *Id.* This identifier allows the system to retrieve demographic information about the audience member/phone user. The audience member's demographics are available from various sources, including those accessible by the audience member's phone and phone number (*e.g.*, an identifier associated with the mobile phone) such as from their cell provider. *Id.* The system determines that the GPS components received from the phone fall within an area of interest, in this case, a particular bar (*e.g.*, a reference location). *Id.* In addition, automated content monitoring (such as ACR or STB monitoring) associated with the bar's TVs identifies and records the media playing in the bar (*e.g.*, media identifying information). *Id.* Using the record of what media content was playing in the bar while the phone user was there, the system associates the media identifying information with the audience member's demographic information. This is done repeatedly for multiple audience members. *Id.*

33.     In reciting a particular way to improve audience measurement, all the claims of the '402 patent recite the combination of (1) receiving an identifier of a mobile device that is associated with demographic data about the mobile device user, (2) receiving the mobile device's location, (3) accessing media identifying information about media content presented within the reference area during a period of time, and (4) associating the demographic data with the media identifying information. As of April 24, 2013, and as of December 18, 2013, this combination of elements was not well-understood, routine, or conventional in the prior art. Ex. 2, ¶25.

34.     Moreover, all the claims of the '402 patent recite a particular way of associating demographic information and media content data. Ex. 2, ¶26. In particular, the claims require

making that association in a particular way—using the mobile device's location to determine whether the audience member's mobile device is in a reference area where known media content is being presented. *Id.* The claims then recite associating the media content being presented with demographics associated with the mobile device identifier. *Id.*

35.     The invention and the claims do not preempt other ways of associating media content data with demographics or other ways of measuring audiences. Ex. 2, ¶27. For example, when a person is out of the home, a manual diary can be used. *Id.* In addition, out-of-home systems could be used that do not involve location or that do not use location to associate demographic information with media content. Alternatively, a person's mobile device could determine the media the person is exposed to by generating fingerprints from ambient audio and send those fingerprints to a server where they would be matched against reference fingerprints. *Id.* Or an alternate system could record only census data—*i.e.*, measurement data lacking demographics. By incorporating a specific technique, the claims are limited to a specific process for associating media information and demographic information and do not preempt approaches that use other techniques or other ways of measuring audiences. *Id.*

36.     All the claims of the '402 patent are directed toward a technical improvement in audience measurement that applies to computer systems as a whole by using location to correlate demographics and media content to improve media measurement. Ex. 2, ¶28. As such, all the '402 patent's claims recite a particular means of measuring audiences and their demographics, not just the desired result of measuring audience demographics. *Id.*

37.     The claims of the '402 patent improve technical functionality in audience measurement technology itself, not economic or other tasks that use a computer in its ordinary capacity. Ex. 2, ¶29. The invention improves media measurement technology to increase data

value and the breadth of data collection by correlating media content with its audience's demographics. All the claims therefore recite an improved audience measurement process, system, and method for producing a certain result in a certain way and not solely the result or effect produced. *Id.*

38.     The '402 patent and its claims do not recite processes and systems that can be performed in a human mind. Ex. 2, ¶30. All the claims recite data analysis and associating of data in a manner that cannot be performed in a human mind. *Id.* Nor can the human mind receive a message sent from a mobile phone.

## THE INFRINGING APPARATUS AND METHOD

39.     VideoAmp uses an apparatus ("the Infringing Apparatus") and employs a method ("the Infringing Method") as components of its audience measurement products and services that associate audience demographic data and media content identification using location as described below.

40.     "VideoAmp provides demographic and advanced audience measurement for linear, digital, and cross-platform content and campaigns." Ex. 7, "Convergent TV Measurement Guide," CIMM p. 57. VideoAmp announced it was developing an outside-of-home ("OOH") measurement product "in 2H 2022 or 2023." Ex. 8, NBCUniversal Measurement Framework, Look Book V.1, https://together.nbcuni.com/wp-content/uploads/sites/3/2022/02/NBCU-Measurement-Framework-Look-Book-V1-Feb-2022-1.pdf p. 112. VideoAmp has since released its OOH product. *See, e.g.*, Ex. 9, Jenny Wall, VideoAmp Chief Marketing Officer, https://www.youtube.com/watch?v=ygfILqGFbz0, at 6:45-7:40, June 20, 2024; Ex. 10, Adria Jewell, VideoAmp VP Product Methodology, VAMPFRONT 2024 Product Roadmap,

https://videoamp.com/video/pv/2024-product-roadmap/, 0:45-1:40, March 28, 2024 ("We're building an industry-first approach to out of home measurement").

41.    VideoAmp's current Executive Chairman Peter Liguori described its OOH product and how valuable it is to VideoAmp to be able to offer such a product:

> Sports is must-have programming…. It does show the immense value of sports. And for us at VideoAmp, frequently when we go to clients, they really want another sports product…. We're building that. A lot of sports is viewed out-of-home. And we use geolocation; we use ACR; we use a number of different methods to more accurately measure and locate where viewership is happening. And that's wildly attractive to a number of parties. It's attractive to advertisers. It's attractive to publishers. It's attractive to the leagues…. So when we fully roll out our sports product versus what's out there, we feel that we're going to be able to really work with the leagues, with the licensors, and with the brands that buy on that programming…..

Ex. 11, Peter Liguori, The Right Spot – Evan Shapiro, at 34:30 (Jan. 26, 2024),

https://eshap.substack.com/p/the-right-spot.

42.    Adria Jewell, VideoAmp's VP Product Methodology, described how VideoAmp's OOH product combines geolocation information from the cell phones of people visiting bars and restaurants with the content displayed on connected TVs at those locations:

> We look at 2.5 million smart TVs and over 55,000 bars and restaurants- a number that grows every week. In order to understand what events are playing where and combine that with geolocation data to identify the number of people in those bars and restaurants at the time of those events.

Ex. 10, Adria Jewell, VideoAmp VP Product Methodology, "2024 Product Roadmap," presented at VAMPFRONT, https://videoamp.com/video/pv/2024-product-roadmap/ at 1:06-23.

VideoAmp also claims that it "has gotten praise from executives on both the sell and buy side for a first-of-its-kind out-of-home measurement system it's rolling out, focused on sports programming. VideoAmp's system matches location signals from consumer mobile devices to programming on TV sets in bars and restaurants to allow for passive audience measurement."

Ex. 6, https://adage.com/article/measurement/videoamp-ceo-ross-mccray-steps-down-company-lays-20-staff/2535441.

43.    VideoAmp measures audience members using a mobile phone: "VideoAmp today announced its ability to measure audience reach and frequency for YouTube across CTV, desktop and mobile." Ex. 12, "VideoAmp to Measure Deduplicated YouTube Reach and Frequency," Press Release, https://videoamp.com/press/videoamp-to-measure-deduplicated-youtube-reach-and-frequency/; *see also*, Ex. 7, "Convergent TV Measurement Guide: Understanding Innovation in Video Measurement," CIMM p. 60 ("VideoAmp measured mobile and desktop via digital identifiers such as cookies and device IDs captured via measurement pixel or publisher digital ad log files.").

44.    VideoAmp measures mobile devices using digital identifiers and received geo-location data. VideoAmp tracks the location of its audience members, including those with mobile phones: "We augment such TV Viewership data with other information that we license from third-party data providers, which may include information about demographics (including gender and ethnicity), age, location information, inferred interests, purchases, and information regarding the probability and nature of connections between devices (such as smartphones, tablets, computers, game consoles, and Internet-connected TVs) (together with TV Viewership Data, 'Licensed Data')." Ex. 13, VideoAmp Privacy Policy, https://videoamp.com/privacy-policy/; *see also* Ex. 14, "Privacy Notice," VideoAmp, https://videoamp.com/us-privacy-notice/ (VideoAmp collects "identifiers (such as a unique personal identifier, an online identifier (e.g., a device ID or a mobile advertising ID, media identifiers), or an internet protocol address)").

45.    VideoAmp collects and uses "[g]eolocation data (such as city, state or zip code, including inferred location from IP address)" and "precise geolocation data." Ex. 14, "Privacy

Notice," VideoAmp, https://videoamp.com/us-privacy-notice/. VideoAmp uses "geolocation data to identify the number of people in those bars and restaurants at the time of those events all while maintaining privacy." Ex. 10, 2024 Product Roadmap at 1:15, presented at VAMPFRONT, https://videoamp.com/video/pv/2024-product-roadmap/. VideoAmp accesses geolocation data of mobile phones based on a physical boundary of a bar or restaurant "at the time of those events." *See id.*

46.     VideoAmp partners with multiple first-party and third-party providers to aggregate demographic information as part of their identity solution. Ex. 15, "VideoAmp Introduces VALID, the Big Data and Technology Engine Powering their Advanced Currency Adoption and Growth in Media Measurement," Press Release, https://videoamp.com/press/videoamp-introduces-valid-the-big-data-and-technology-engine-powering-their-advanced-currency-adoption-and-growth-in-media-measurement/ ("Supercharged by various datasets, VALID helps advertisers and publishers reach their intended audiences at the optimal frequency to drive more sales and create a more favorable consumer experience."). VideoAmp uses multiple sources, including Experian, to create identity graphs to aggregate demographic information about its audience members. *See* Ex 16, "Identity Resolution: Why It's Crucial for Cross-Platform Audience Measurement," VideoAmp, https://videoamp.com/blog/identity-resolution-why-its-crucial-for-cross-platform-audience-measurement/; *see also*, Ex. 17, "Experian Syndicated Audiences," Experian, p. 51, https://www.experian.com/content/dam/marketing/na/assets/ems/marketing-services/documents/guides/Experian_Syndicated_Audience_Guide.pdf ("Experian uses data sourced from mobile application developers and publishers, data aggregators, mobile ad networks, and exchanges as a foundation in the development of our mobile location audiences.").

VideoAmp also "receive[s] demographic information from data licensors such as gender, ethnicity and age" and a "consumer's racial or ethnic origin." Ex. 14, "Privacy Notice," VideoAmp, https://videoamp.com/us-privacy-notice/.

47.     On information and belief, VideoAmp identifies mobile phones located in bars and restaurants and determines their users' demographics by contracting with Motionworks to utilize its Placecast® product that provides "[v]isitation insights for places of all types and sizes" and "granular timing metrics, audience insights and visitor behaviors." Ex. 18, *Placecast*, Motionworks, https://www.mworks.com/placecast/; Ex. 19, Josh Chasin, LinkedIN post.

48.     "Motionworks has unique partnerships with mobile location providers sourcing robust data from first-party apps." Ex. 20, "Data Inputs and Cleansing," Motionworks, https://docs.mworks.com/docs/methods-people-data-inputs; Ex. 21, *Motionworks Platform: Workspaces Video*, https://www.youtube.com/watch?v=OeVXme8TfMs. "The primary source of mobile location data Motionworks acquires is provided by multiple Software Development Kit (SDK) aggregators. These aggregators rely on location information collected apps installed on mobile devices. Motionworks has a continuous stream of data coming from multiple SDK aggregators." Ex. 20, "Data Inputs and Cleansing," Motionworks, https://docs.mworks.com/docs/methods-people-data-inputs.

49.     "Motionworks maintains a panel of mobile devices from which all data products and solutions are built. These are the most valuable devices providing consistent, frequent, and reliable location data over the course of a week. Devices in the Motionworks panel have stable enough patterns of activity to establish home neighborhoods (U.S. Census block groups), reasonable travel and activity patterns, and they are geographically balanced." Ex. 24,

"Identification of the Panel," Motionworks, https://docs.mworks.com/docs/methods-people-panel.

50.     Using Motionworks' Placecast® product, a user may select a location such as a restaurant or create their own polygon to measure who visits the area within the polygon. Ex. 22, https://support.mworks.com/hc/en-us/articles/22004747755917-2-How-to-Add-a-Place-for-Placecast-Dashboard. "Placecast™ allows users to request and review place-based visits data. This includes visitation to specific places or regions for specific periods of time." Ex. 18, https://www.mworks.com/placecast/. Placecast® provides: "Weekly, daily, and hourly metrics[,] Historical data back to January 2019[,] Visitor Location of Residence[,] Frequency of visitation[,] Venue dwell time[,] Event-based measurement for specific days & times[,] Measurement across all sizes and types of places, from regional analysis to custom spaces created in our platform." Ex. 18, https://www.mworks.com/placecast/.

51.     VideoAmp receives ACR and set-top-box information for the devices such as televisions at bars and restaurants. VideoAmp "brings together unique data characteristics from Set-Top-Box (STB) data commingled with Automatic Content Recognition (ACR) data to create the largest and most robust linear television and OTT dataset powering the advanced television market today." Ex. 23, "VideoAmp Releases Commingled TV Viewership Dataset," Press Release, https://videoamp.com/press/press-release-videoamp-releases-commingled-tv-viewership-dataset/. "The biggest thing is out of home viewing. . .our product relies on actually bars and restaurants like thousands of them where we pull in the television data." Ex. 9, "Chief Marketing Officer at VideoAmp joins Shannon Pruitt, Stagwell Bxp Global CMO," SPORT BEACH 2024, at 6:45-7:35 https://www.youtube.com/watch?v=ygfILqGFbz0.

52.     Upon information and belief, VideoAmp combines the information about what content is playing at these bars and restaurants with Motionworks's data identifying the mobile devices (and their associated demographics) located in those establishments to associate these demographics with this content. According to VideoAmp, "[w]e look at 2.5 million smart-tvs and over 55,000 bars and restaurants- a number that grows every week. In order to understand what events are playing where and combine that with geolocation data to identify the number of people in those bars and restaurants at the time of those events all while maintaining privacy. We believe our approach will deliver a more holistic, accurate, and representative picture of out of home viewership." Ex. 10, 2024 Product Roadmap at 1:06, presented at VAMPFRONT, https://videoamp.com/video/pv/2024-product-roadmap/.

53.     VideoAmp's infringement allows it to offer currency products to customers in competition with Nielsen. "VideoAmp recently revealed it has $3 billion in guaranteed currency as of the close of 2024, marking an 880% year over year increase. Netflix recently struck a deal with VideoAmp to deliver cross-screen and live viewership measurement starting with the launch of WWE." Ex. 32, https://www.thewrap.com/paramount-videoamp-ratings-measurement-partnership-renewal/; *also* Ex. 33, https://www.sportsbusinessjournal.com/Articles/2025/01/09/wwe-netflix.

54.     VideoAmp competes with Nielsen for customers, including Paramount. "US measurement provider VideoAmp has announced an extension of its long-term partnership with Paramount Global, in a deal which will see Paramount continue to use VideoAmp's data to measure viewing across its media properties, while also offering VideoAmp as an alternative currency to its advertising partners." Ex. 34, https://videoweek.com/2025/01/08/videoamp-marks-continued-currency-growth-with-renewed-paramount-deal/. VideoAmp executive vice

president of revenue Bryan Goski stated that VideoAmp is "excited to continue to grow our partnership [with Paramount], leading the industry in measurement and advanced currency solutions driven by big data and tech which ultimately deliver better and more measurable results." Ex. 32, https://www.thewrap.com/paramount-videoamp-ratings-measurement-partnership-renewal/.

55.     VideoAmp uses the Infringing Apparatus and the performance of the Infringing Method to compete with Nielsen and to provide its allegedly "alternative" currency.

56.     By making, using, offering to sell, and selling the Infringing Apparatus and performing the Infringing Method (and/or directing or controlling Motionworks and/or others to do so), VideoAmp is infringing the '402 patent as described herein and in the claim charts attached hereto as Exhibit 3, which are hereby incorporated by reference into this Complaint.

57.     Nielsen seeks to enjoin VideoAmp from any further unauthorized use of Nielsen's patented technology. Nielsen also seeks to recover damages, including lost profits, reasonable royalties, increased damages, reasonable attorneys' fees, and other such relief as the Court deems just and proper for VideoAmp's violation of Nielsen's patent rights under federal law.

## COUNT I

## INFRINGEMENT OF THE '402 PATENT

58.     Nielsen repeats and re-alleges paragraphs 1-57 as if fully set forth herein.

59.     VideoAmp has infringed and continues to infringe, literally or under the doctrine of equivalents, at least claims 1-2, 4, 6-7, 9, 11-13, 15-16, 18, 20-23, 25-26, 28, and 30 of the '402 Patent ("the Asserted '402 Claims") under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell in the United States, and/or importing into the United States, the Infringing

Apparatus and by performing the Infringing Method (and/or directing or controlling others to do so) in the United States.

60.    VideoAmp's activities are without license or permission from Nielsen.

61.    The Infringing Apparatus and the Infringing Method include all elements of the Asserted '402 Claims, either literally or equivalently, as shown in the claim charts incorporated by reference in this Complaint and attached hereto as Exhibit 3.

62.    VideoAmp has knowledge of the '402 patent as of the date of service of the Complaint, and VideoAmp is willfully and deliberately infringing the '402 patent at least as of the service date of this Complaint.

63.    Through the conduct alleged above, VideoAmp has caused and will in the absence of an injunction continue to cause Nielsen to suffer damages, which in no event are less than a reasonable royalty, and which include, but are not limited to, lost sales and sales opportunities.

64.    VideoAmp has also irreparably harmed Nielsen. Unless and until VideoAmp is enjoined by this Court from further infringement of the '402 patent, Nielsen will continue to suffer irreparable injury for which it has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Nielsen prays for judgment against Defendant VideoAmp as follows:

A.    A judgment that Defendant has infringed the '402 patent;

B.    A judgment that Defendant's infringement of the '402 patent is willful;

C.    An order permanently enjoining Defendant and its officers, directors, agents, servants, employees, affiliates, and all others acting in privity or in concert with

them, and their parents, subsidiaries, divisions, successors, and assigns, from

further acts of infringement of the '402 patent;

D.    An award of damages adequate to compensate Nielsen for Defendant's

infringement of the '402 patent, including increased damages up to three times the

amount found or assessed, together with pre-judgment and post-judgment interest

and costs, under 35 U.S.C. §§ 154(d) and 284.

E.    A judgment that this case is exceptional and an award of Nielsen's reasonable

attorneys' fees, costs, and expenses under 35 U.S.C. § 285; and

F.    An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.

|  |  |
|---|---|
| | Respectfully submitted, |
| | POTTER ANDERSON & CORROON LLP |
| OF COUNSEL: | |
| | By: */s/ David E. Moore* |
| Steven Yovits | David E. Moore (#3983) |
| Douglas Lewis | Bindu A. Palapura (#5370) |
| Jason P. Greenhut | Hercules Plaza, 6th Floor |
| Andrew Wood | 1313 N. Market Street |
| KELLEY DRYE & WARREN LLP | Wilmington, DE  19801 |
| 333 West Wacker Drive | Tel:  (302) 984-6000 |
| Chicago, IL 60606 | dmoore@potteranderson.com |
| Tel: (312) 857-7070 | bpalapura@potteranderson.com |
| | |
| Dated: April 2, 2025 | *Attorneys for Plaintiff The Nielsen* |
| 12151000 / 14944.00010 | *Company (US), LLC* |